**Cecil C. RAM, M.D., Plaintiff,**

v.

**Margaret M. HECKLER, individually and in her official capacity as Secretary of the United States Department of Health and Human Services, Defendant.**

**No. ST–C–85–148.**

United States District Court,
W.D. North Carolina,
Statesville Division.

Aug. 30, 1985.

Julia V. Jones, Moore, Van Allen, Allen & Thigpen, Charlotte, N.C., for plaintiff.

Clifford Marshall, Asst. U.S. Atty., Charlotte, N.C., for defendant.

## TEMPORARY RESTRAINING ORDER

McMILLAN, District Judge.

This case came before the court on August 26, 1985, on a motion by the plaintiff, Dr. Cecil C. Ram, for preliminary and declaratory relief. Both parties were represented by counsel and evidence was submitted by affidavits.

The plaintiff is a urologist in Statesville, Iredell County, North Carolina. In 1982, he pleaded guilty to one misdemeanor count of violating 18 U.S.C.A. § 1003. The alleged violation apparently was a result of Dr. Ram's submitting requests for payments from Medicare and Medicaid that improperly itemized procedures that should have been aggregated. The court's present understanding is that federal regulations prohibited a separate charge for corrective surgery done within five days of diagnostic surgery. Dr. Ram was told he

had violated § 1003 even though he had not withheld or misrepresented any information and in fact had followed billing procedures common among urologists in North Carolina and in North Dakota, where he practiced before coming to North Carolina.

In August, 1985, almost three years after the guilty plea, Dr. Ram was informed by the Department of Health and Human Services (HHS) that it was suspending for one year his right to participate in the Medicare program and instructing the state Medicaid agency to suspend him from that program also for one year. *Letter of August 7, 1985* (exhibit A of plaintiff's complaint). The suspension was based on 42 U.S.C.A. § 1320a–7 (1983), which mandates suspension whenever a physician is convicted of a criminal offense related to the delivery of medical services under Medicare or Medicaid.

Dr. Ram was informed that he could request a hearing before an Administrative Law Judge (ALJ) to contest the length of the suspension but that the suspension was effective in fifteen days. The suspension has an enormous immediate impact on the doctor. It effectively prevents him from practicing medicine. This is so because over 60% of his patients receive Medicare or Medicaid, and because, due to hospital regulations, he will lose the privilege to admit *any* patients to the three hospitals available to him.

The impact of the suspension on patients in Iredell County is also extreme. Dr. Ram is one of only two urologists in the county. He is the only one who performs complex procedures such as radical cancer surgery and prosthetic surgery. In addition, he performs about half of all the surgery at Lowrance Hospital, and the majority of urological procedures at Iredell County Hospital. Finally, due to the short notice of the suspension (thirteen days), Dr. Ram has been unable to arrange for appropriate alternative care for his present patients.

Consequently, Dr. Ram urges the court to enjoin the suspension pending his administrative appeal. Such an injunction is necessary, he argues, because it may be more than a year before his administrative appeal is heard. In that case, any remedy might well be too late.

## I.

The first issue is whether the court has jurisdiction to grant a preliminary injunction. The attorney for HHS argues that the court does not because the relevant statute, 42 U.S.C.A. § 1320a–7(e) (Supp. 1985), does not provide for injunctive relief. The government argues that this reflects a Congressional intent that suspensions not be enjoinable and that they be effective upon preliminary determination. The argument is that Congress meant to prevent Medicare fraud from continuing during the period after the original determination by the Secretary that the physician had been convicted of Medicare fraud and before the final agency decision on the matter. Under the government's argument, the court has no jurisdiction at all until a final agency determination has been reached.

The government's argument is ill-founded. Section 1320a–7(e) provides that

> any person who is the subject of an adverse determination ... under this section shall be entitled ... to judicial review of the Secretary's final decision after [an agency] hearing as is provided in section 405(g) of this title.

42 U.S.C.A. § 1320a–7(e) (Supp.1985). Consequently, § 405(g) is the appropriate section to look to in deciding whether this court may enjoin the suspension here.

Section 405(g) does not expressly provide that a court may enjoin administrative action prior to a pending administrative hearing and a final decision. The exact relevant language of the section is:

> Any individual, after a final decision by the Secretary made after a hearing in which he was a party, may obtain review of such decision by a civil action.... The court shall have the power to enter ... a judgment affirming, modifying, or reversing the decision of the Secretary....

42 U.S.C.A. § 405(g) (1983).

However, in *Califano v. Yamasaki,* 442 U.S. 682, 99 S.Ct. 2545, 61 L.Ed.2d 176

(1979), the Court held that injunctive relief was permissible under the statute. There, the plaintiff class challenged procedures instituted by the Secretary to recoup overpayments in old-age, survivors, and disability insurance programs. The statute itself allowed the Secretary to recoup overpayments by reducing the amount of future payments to which the overpaid person was entitled. Under the Secretary's procedure, once an *ex parte* determination of overpayment was made, the recipient could file a written request for reconsideration. If the reconsideration was unfavorable to the recipient, recoupment began. Only if the recipient continued to object did he have the opportunity for an oral hearing, something deemed quite important because intent was a factor in overpayment decisions.

The district court found the Secretary's procedure unconstitutional and enjoined the Secretary from beginning recoupment in any case prior to holding a hearing in the case. At the Supreme Court the agency argued that § 405(g) permitted only affirmance, modification, or reversal of the agency's final decision on recoupment. The Secretary maintained that injunctive relief before a final decision was totally precluded.

According to the Supreme Court, however,

"absent the clearest command to the contrary from Congress, federal courts retain their equitable power to issue injunctions in suits over which they have jurisdiction."

*Id.* at 705, 99 S.Ct. at 2559. The Court found that no language in the statute and nothing in the legislative history gave any indication that Congress intended to preclude injunctive relief in suits under § 405(g). Such relief was in fact essential to § 405(g) litigation:

Without the power to order a stay of recoupment pending decision, a court for all practical purposes would be unable to "reverse" a decision concerning prerecoupment rights.

*Id.*

■ Because § 1320a–7(e) simply refers us to § 405(g) on the issue of judicial review, the Court's decision that injunctive relief is appropriate in actions under § 405(g) effectively settles the issue of injunctive relief under § 1320a–7(e). This court therefore has the authority under § 1320a–7(e) and § 405(g) to enjoin the Secretary from suspending the plaintiff from participating as a provider in the Medicare and Medicaid programs.

## II.

■ The next question is whether in the circumstances of this case a preliminary injunction should issue. The standard in the Fourth Circuit for deciding whether to issue a preliminary injunction is the balance-of-hardship test. *Blackwelder Furniture Co. v. Seilig Manufacturing Co.,* 550 F.2d 189 (4th Cir.1977). Under this test the district court's decision must be based on a flexible interplay of four factors: (1) the likelihood of immediate irreparable harm to plaintiff without the injunction; (2) the likelihood of harm to defendant with the injunction; (3) plaintiff's likelihood of success on the merits; and (4) the public interest. *Telvest, Inc. v. Bradshaw,* 618 F.2d 1029, 1032 (4th Cir.1980).

### Balancing the Harm

The first step is to balance the likelihood of harm to the plaintiff without the injunction against the likelihood of harm to the defendant with the injunction, that is, to compare the first two factors above. *Blackwelder,* 550 F.2d at 195.

■ The suspension of the plaintiff's privilege to participate as a medical service provider in Medicare and Medicaid became effective on August 22, 1985. The court understands that because the plaintiff doctor is a urologist, a high percentage (around 60%) of his patients are elderly and on Medicare or Medicaid. Dr. Ram is effectively foreclosed from treating these patients any longer. In addition, because the three hospitals available to him require staff doctors to be available to care for Medicare and Medicaid patients on an

emergency basis, Dr. Ram will lose staff privileges and therefore be unable to treat any hospitalized patients. This will destroy most of his ability to earn a living, as shown by the fact that he does over half of all the surgery at Lowrance Hospital and the majority of the urological procedures at Iredell Hospital. In addition, it will require him to close his urological clinic.

There is no doubt that Dr. Ram faces immediate overwhelming harm if an injunction is not issued. Furthermore, this harm is clearly irrevocable: nothing HHS later does could possibly remedy the harm. Dr. Ram's reputation and practice may be shattered. He will be deprived of much of his income for a year and his patients will suffer. The irrevocable nature of the damage is exacerbated by the fact that HHS may not even reach Dr. Ram's administrative appeal until after the suspension ends a year from now!

On the defendant's side, there will be no harm at all to HHS if the suspension is stayed pending administrative appeal. HHS has waited three years to suspend Dr. Ram; it can without prejudice wait another. Furthermore, even taking at face value the reason offered by the government to justify the assertion that Congress intended no injunctive relief to be available, there is absolutely no evidence that Dr. Ram will "continue" to defraud Medicare and Medicaid if in fact he ever defrauded them. In this respect, because three years have passed, the government should offer some evidence that Dr. Ram will again "defraud" the government. The evidence that Dr. Ram pleaded guilty to a misdemeanor count of violating § 1003 three years ago (when the facts as understood by this court at this time indicate that he was not guilty of violating that statute), does not suggest he will defraud the government during the pendency of the administrative appeal.

Thus on the plaintiff's side, we have an overwhelming, immediate, and irrevocable harm if no injunction is issued. On the defendant's side, we have absolutely no harm if an injunction is issued. There may indeed be cases under § 1320a–7 in which

an injunction would harm the government because the doctor would continue to defraud the government; this is not one.

*Likelihood of Success on the Merits*

The first two factors from *Telvest* aside, the court now considers the third factor in the equation for preliminary relief—the likelihood that the plaintiff will succeed on the merits when his appeal is heard.

■ The irreparable harm to plaintiff if no injunction is granted vastly outweighs the harm to the government if an injunction is granted. In such a case, plaintiff's job is to raise "questions going to the merits that are so serious, substantial, difficult and doubtful as to make them fair ground for litigation and thus for more deliberate investigation." *Blackwelder*, 550 F.2d at 195 (quoting *Hamilton Watch Co. v. Benrus Watch Co.*, 206 F.2d 738, 740 (2d Cir. 1953)). In other words, where *"serious"* issues are before the court and the *status quo ante litem* can be maintained without excessive burden on the defendant, this should be done because "otherwise effective relief may become impossible." *Blackwelder*, 550 F.2d at 194–95.

■ In this case, the plaintiff has clearly shown that "serious issues" exist as to the merits. Moreover, the plaintiff even satisfies the higher standard of being likely to succeed on the merits. There are several parts to this proposition.

First, the plaintiff pleaded guilty to a violation of § 1003 for acts that under the present understanding of the court do not qualify as violations of that section. The statute states that

> Whoever *knowingly and fraudulently* demands ... to have any ... debt due from the United States ... paid by virtue of any *false, forged,* or *counterfeit* ... instrument, shall be fined ... or imprisoned ..., or both....

18 U.S.C.A. § 1003 (1976) (emphasis added). Apparently the regulations stated that a doctor could not be paid separately for diagnostic surgery and corrective surgery done within five days of each other. If the

two were done within five days, the doctor was to be paid only for one procedure. At the hearing the court asked counsel what Dr. Ram had done to violate the law. His lawyer stated, without contradiction by the United States attorney, that he had sent, and received payment for, a number of bills which *on their face* showed separate charges for a diagnostic procedure and a corrective procedure performed within five days of each other. Such a bill may well be an overcharge, but it is a far cry short of being "fraudulent," "false," "forged" or "counterfeit." Indeed, Dr. Ram's affidavit states that his requests for reimbursement were based on the same method of computation of charges used by other urologists in North Carolina and in North Dakota, the state in which Dr. Ram previously practiced.

Consequently, there is a distinct possibility that Dr. Ram's actions did not even violate § 1003. This is still more likely when one considers the fact that § 1003 is a criminal statute and must therefore be strictly construed. The court has examined two cases where appellate courts have upheld § 1003 convictions. In *United States v. Rangel,* 585 F.2d 344 (8th Cir.1978), the defendant, an employee of the Environmental Protection Agency (EPA), submitted vouchers to the EPA requesting reimbursement for travel expenses. To each voucher was attached a photocopy of a customer's copy of the Master Charge sales receipt. However, the photocopies in each instance showed greater expenses than did the copies retained by the merchants. The court found that a *deliberate act* was necessary to *alter* the customer's copies and photocopy them so that the alterations would not be discernible. Thus, the evidence was obviously sufficient to show fraud. *Id.* at 346-47.

In *Tucker v. United States,* 624 F.2d 1029 (Ct. of Claims 1980), the plaintiff was an employee of the Federal Aviation Administration (FAA) who was fired for violating § 1003 by submitting *false* travel expense vouchers. The plaintiff there *expressly claimed expenses for his wife and children when they did not in fact accom-* *pany him.* The amounts involved were quite large and were questioned by the FAA. He resubmitted them apparently unchanged. In each case, he had signed them certifying their correctness. The court found that substantial evidence showed plaintiff had "intentionally and with the purpose to defraud the government falsified these two vouchers." *Id.* at 1033.

Those cases involved actions several orders of magnitude more reprehensible than the actions, as presently understood, of Dr. Ram. Dr. Ram, on the showing before the court, did not "knowingly" or "fraudulently" use any "false or forged" instrument. What he submitted, we are told, was factually correct. HHS simply paid the bills, without objection, in violation of its own regulations.

The second reason why Dr. Ram will probably prevail on the merits is that a suspension should terminate once the Secretary finds that "the basis for such determination [that the doctor has defrauded Medicare or Medicaid] has been removed" and that "there is reasonable assurance that it will not recur." 42 U.S.C.A. § 1320a-7(d) (Supp.1985). Here, where three years have elapsed since the actions which gave rise to the § 1003 conviction occurred, the fact that no similar acts have occurred in the interim strongly suggests that "the basis for such determination has been removed." Furthermore, the fact that they have not recurred in three years suggests that they will not recur. Where three years have elapsed, these inferences can reasonably be made.

The third reason why Dr. Ram will probably prevail either at the hearing or at judicial review is that § 1320a-7(a)(1) itself suggests that any suspension should have taken place *soon after* the plea of guilty. The statute says:

> *When the Secretary determines* that a physician has been convicted ... the Secretary ... shall bar [the physician].

42 U.S.C. § 1320a-7(a)(1) (emphasis added). The language implies that the bar shall be raised more or less concurrently with the

Secretary's determination that the physician has been convicted of Medicare-Medicaid fraud. Here the government has not shown—and it cannot show—that the Department's knowledge of Dr. Ram's conviction is of recent origin. Thus, HHS has violated the intent of the statute by delaying so long.

This interpretation is buttressed by the fact that subsection 1320a–7(a)(2) twice directs the Secretary, on determining that the physician has been convicted, to *"promptly"* do certain acts. Promptly of course means "soon" if not immediately. The absence of that word in the prior subsection suggests to this court that the doctor should have been barred immediately if at all. This conclusion is based in part on the argument by the government at the hearing that Congress did not provide for a stay of a suspension pending an administrative hearing because it desired to prevent Medicare fraud in the interim. If that was Congress's desire, Congress must surely have meant that the physician be barred as soon as the Secretary found that he has been convicted of Medicare fraud.

The final reason why Dr. Ram will probably succeed on the merits is based on a close reading of the Secretary's regulation regarding the length of the suspension. According to 42 C.F.R. § 420.125 (1983) the following factors are to be considered:

(1) The number and nature of the program violations and related offenses;

(2) The nature and extent of any adverse impact the violations have had on beneficiaries;

(3) The amount of damage incurred by Medicare, Medicaid, etc.;

(4) Whether there are any mitigating circumstances;

(5) The length of sentence imposed by the court;

(6) Any other factors bearing on the nature and seriousness of program violations; and

(7) The previous conviction record of the party under Medicare and Medicaid.

With respect to these factors, the Secretary found:

(1) *One misdemeanor* violation of 18 U.S.C. § 1003;

(2) *Minimal* financial impact on Medicare beneficiaries;

(3) All *damages had been repaid;*

(4) The violation was of a "lesser degree of seriousness";

(5) The sentence was six months suspended with one year probation and restitution plus a fine of $500;

(6) Restitution ($1,957.00 for 24 claims) was made long ago. In addition, the North Carolina Medicare carrier recouped $4,594.94 for related services that should not have been itemized.

(7) Dr. Ram had not been previously sanctioned under Medicare or Medicaid.

In addition to those factors, the Secretary considered the time elapsed since the "conviction." *Letter, supra.*

It is immediately apparent in Dr. Ram's case that the Secretary overlooked a great many things. She did not consider as mitigating circumstance the nature of Dr. Ram's conviction. She did not consider whether or not Dr. Ram was in fact guilty of a § 1003 violation. She did not consider that while Dr. Ram pleaded guilty to a § 1003 violation, Dr. Ram was never informed by his attorney, the United States attorney, or the judge that suspension from the Medicare and Medicaid programs would necessarily result. If Dr. Ram had been advised of that, he might not have pleaded guilty. Further, the Secretary did not consider that the North Carolina Board of Medical Examiners had found no wrongdoing on the part of Dr. Ram.

In addition, the Secretary did not consider as a mitigating circumstance that Dr. Ram was calculating his bills in the same way as other North Carolina urologists. The Secretary did not consider as mitigating circumstances or other facts the impact of the suspension on the citizens of Iredell County. That is, she did not consider that Dr. Ram was one of only two urologists in

Iredell County and the only one who performs complex procedures. If he is suspended, all his patients will have to travel to Charlotte, Winston-Salem, or other cities for treatment. Lastly, the Secretary did not consider impact of the suspension on Dr. Ram himself. Dr. Ram, as a urologist with largely elderly patients, is hit hard by a suspension. The Secretary did not mention this.

### *The Public Interest*

 The final factor in the decision to issue a preliminary injunction is how an injunction affects the public. Here, if Dr. Ram cannot participate as a Medicare/Medicaid service provider, Iredell County and his patients will be significantly harmed. He is, as before mentioned, one of only two urologists in the county and the only one who performs complicated procedures. He does the majority of the urological procedures in one of the two hospitals in Iredell, and 50% of all the surgery in the other hospital. In addition, because three years have passed since his questionable conviction, he has acquired a substantial number of patients. Because Dr. Ram has not had enough time to arrange for a replacement, these patients will be left without a doctor if Dr. Ram is suspended.

On the other side of the public interest equation is the interest in preventing Medicare fraud from continuing. In this case, there is substantial evidence that such fraud, if it ever existed, has not continued. There is no evidence over three years that it has continued.

Finally, there is a public interest in preventing mindless infliction of punishment which does not comport with the directions of Congress and is simply unnecessarily punitive.

### III.

IT IS THEREFORE ORDERED that, pending further orders of the court, the suspension of the plaintiff is null and void, and that pending the exhaustion of his administrative appeals, plaintiff is free and shall be allowed to participate fully as a provider of medical services in the Medicare and Medicaid programs. As part of this order, the defendant shall instruct the state Medicaid agency to reinstate the plaintiff to full participation pending his administrative appeal.

Plaintiff's reinstatement will remain in effect until further order of this court.

The clerk will set the case for hearing, by September 10, 1985, on the question whether this temporary restraining order shall continue pending final decision on the merits.